**Marie COSTELLO, Plaintiff,**

v.

**ST. FRANCIS HOSPITAL, Defendant.**

**No. 01–CV–759(DRH)(WDW).**

United States District Court, E.D. New York.

April 16, 2003.

Somma, Zabell & Associates, LLP, Farmingdale, By Saul D. Zabell, Esq., for Plaintiff.

Putney, Twombly, Hall & Hirson, LLP, New York, By Mark A. Hernandez, Esq., Of Counsel, for Defendant.

## DECISION AND ORDER

HURLEY, District Judge.

Plaintiff filed this action against her former employer, alleging that she was unlawfully terminated based on her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, and the New York State Human Rights Law ("NYHRL"), Executive Law Section 296. Currently before the Court is Defendant's motion for summary judg-

ment. For the reasons that follow, Defendant's motion is granted.

## I. BACKGROUND

### A. Undisputed Facts

The facts in this section of the opinion are taken from Plaintiff's complaint, deposition and answers to interrogatories; from the statements in the parties' Rule 56.1 statements, the accuracy of which has been admitted by the opposite party; and from evidence proffered by Defendant which is not controverted or otherwise inconsistent with the factual position advanced by Plaintiff.

Defendant St. Francis Hospital ("Hospital") is a not-for-profit hospital which specializes in cardiac care, and is a member of the Catholic Health Services of Long Island. Def.'s Local Rule 56.1 Statement ("56.1 Stmt.") ¶ 1. Plaintiff was hired by the Hospital in 1978 as a part-time employee. Id. ¶ 3. She was hired for the position of Switchboard Operator. Id. ¶ 6. In January 1979, Plaintiff began working for the Hospital on a full-time basis. Id. ¶ 7. She was promoted to Chief Operator during the 1980s, id. ¶ 8, to Telecommunications Supervisor in 1994, id. ¶ 17, and to Telecommunications Manager in February 1996. Id. ¶ 19.

Beginning in 1992, Plaintiff reported directly to Martin A. Bieber, Vice President/Chief Information Officer ("Bieber"). Id. ¶ 9. Plaintiff states that she also has had numerous other supervisors, including Anthony Vellucci ("Vellucci") and Joanne Casper ("Casper"), while employed by the Hospital. Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1 Stmt.") ¶ 11.

As Telecommunications manager, Plaintiff "considered herself a member of man-

agement." Def.'s 56.1 Stmt. ¶ 23. As a member of management, Plaintiff was aware that her responsibilities included implementing various Hospital polices. Id. ¶ 27. These policies included a No Solicitation/No Distribution Policy, an Open Door Policy, a Work Rules and Regulation Policy, a Weather Emergency Policy and a Sexual Harassment Policy.[1] See id. ¶¶ 28–41. Plaintiff admits that she was aware of these policies, that they pertained to her and that she was charged with enforcing them. Id. ¶¶ 25–43.[2]

Plaintiff's employment was terminated on February 10, 2000. Pl.'s Dep. at 55; Aff. of Martin Bieber ("Bieber Aff.") ¶ 52. She was advised that the reasons given for her termination were theft of time, sexual harassment and solicitation. Pl.'s Dep at 55–56.

With respect to Plaintiff's physical condition, she first started suffering from Primary Pulmonary Hypertension. Id. ¶ 47. One of the symptoms of this condition is shortness of breath. Pl.'s 56.1 Stmt. ¶ 48. On several occasions, Plaintiff's condition caused her to be hospitalized. Def.'s 56.1 Stmt. ¶ 77. When this occurred, Plaintiff would perform her duties with a laptop that was installed by "her bedside." Dep. of Anthony Vellucci ("Vellucci Dep.") at 39. Plaintiff was also provided with a laptop computer to perform work at home. Dep. of Joanne Casper ("Casper Dep.") at 23.

Starting at the end of 1998 or the beginning of 1999, Defendant provided Plaintiff with oxygen to aid Plaintiff with her breathing. Def.'s 56.1 Stmt. ¶ 72. The oxygen was supplied free of charge. Id. ¶ 74. This service included delivering the oxygen tanks, setting up respiratory

---

1. These policies will be explained *infra*.

2. She does dispute, however, Defendant's claim of even-handed enforcement of these policies. *See, e.g.,* Pl.'s 56.1 Stmt. ¶ 29 ("[A]t no point in time while she [Plaintiff] was employed by Defendant did Defendant enforce its no solicitation/no distribution policy.").

equipment and removing the used tanks. *Id.* ¶ 75.

### B. Events Leading to Plaintiff's Termination

#### 1. Preliminary Observations

Plaintiff maintains that each of the reasons provided by Defendant for her termination is merely a pretext for disability discrimination. Not surprisingly, therefore, she currently contests the bulk of Defendant's rendition of the pre-termination events. In doing so, however, she has, on certain pivotal issues, run afoul of the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affirmant's previous deposition testimony." *Haynes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir.1996); *see also Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

Here, Plaintiff has not submitted an affidavit. But in her Rule 56.1 statement she attempts to create a material issue of fact by disputing Defendant's contention that she was selling chocolate lollipops in the shape of a penis at the Hospital. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 87,90 ("Plaintiff never sold the chocolates in the form of a man's penis"), ¶ 91.[3]

During her deposition, however, Plaintiff testified as follows:

Q. Did you ever sell chocolates in the shape of a man's penis?

A. Yes.

Pl.'s Dep. at 127.

.     .     .     .     .

Q. Miss Costello, I want to show you what the hospital has obtained and ask you if this is one of the chocolates that you were selling. It's in a zip lock bag, and I'd ask you not to remove it from the zip lock bag and also to handle it carefully. I ask you to look at that, please.

Is that one of the chocolates you were selling at the hospital?

A. That's one of the ones that Arthur Britton [sic] wanted, yes.

Q. What is that chocolate?

A. It's a penis with a tuxedo.

Q. Is it made of chocolate?

A. Yes.

Q. Is it a lollipop?

A. Yeah.

*Id.* at 130.

Similarly, in her verified responses to the Hospital's Interrogatory Requests, sworn to on November 27, 2001, Plaintiff provided the following sworn response to the Hospital's inquiry of her sale of chocolates shaped in the form of a penis:

*Interrogatory No. 17:* State whether at any time prior to your termination you possessed, stored or sold at the Hospital candy resembling the shape or form of a man's penis.

*Response to Interrogatory No. 17:* ....Plaintiff responds as follows: In 2000 the plaintiff did sell the described candy.

Plaintiff's Interr. Resp. No. 17. Finally, when questioned by Deirdre J. Duke, the Director of the Human Resources for the Hospital, regarding her sale of the chocolates, Plaintiff admitted that she was selling said chocolates. Aff. of Dierdre Duke ("Duke Aff.") at ¶ 15.

---

**3.** Surely, if a summary judgment generated affidavit will not defeat an adversary's Rule 56 motion, a Rule 56.1 Statement will be similarly ineffective.

Similarly, in Paragraph 20 of her Rule 56.1 Statement, Plaintiff disputes that Bieber was the individual responsible for her promotion from the position of Telecommunications Supervisor to Telecommunications Manager in February 1996. *Id.* In support of this contention, Plaintiff cites page 29 of the transcript of her deposition testimony for the premise that other individuals, as well as Bieber, were responsible for that promotion. However, a review of the cited portion of the transcript reveals the following exchange:

Q. Do you know who was responsible for your promotion to the position of Telecommunication Manager?

A. Martin Bieber.

Pl.'s Dep. at 29.

In addition to endeavoring to create a material issue of fact via unsupported assertions in her Rule 56.1 Statement, Plaintiff often answered questions during her deposition by stating "I don't recall" or "I don't remember." *See, e.g.,* Pl.'s Dep. at 148–150. Such responses, of course, are not to sufficient to counter Defendant's showing that it is entitled to judgment as a matter of law. *Castillo Flores v. Harbor Shipping & Trading Co., S.A.,* 2001 WL 740509 (E.D.La., June 29 2001) (collecting cases); *I.V. Servs. of Amer., Inc. v. Inn Dev. & Mgmt.,* 182 F.3d 51, 55 (1st Cir. 1999) ("[Plaintiff's] mere lack of recollection does not create an issue of fact...").

With the above preliminary observation in mind, the evidence in the record regarding specific events leading to Plaintiff's termination will now be discussed.

### 2. February 8, 2000

#### a. Meeting with Martin Bieber

Defendant states that on February 8, 2000, Bieber was notified by a Hospital security guard that Plaintiff was selling chocolates in the Hospital in the shape of a "penis dressed in a tuxedo." Bieber Aff. ¶ 25.

Bieber states that when he arrived at Plaintiff's office to discuss this claim, Bieber "observed several parcels (boxes and bags) of chocolate in a room adjacent to Costello's office." *Id.* ¶ 27. When Bieber entered the adjacent room, he noticed boxes containing chocolate. *Id.; cf.* Pl.'s Dep. at 120–21. At any given point, Plaintiff stored up to three boxes of chocolates in her office. Pl.'s Dep. at 124–26. He also observed that some of the bags contained "penis shaped lollipops." Bieber Aff. ¶ 27. Bieber took one of these lollipops as part of his investigation. *Id.*

When questioned about the chocolate, Plaintiff stated that she was "holding it for someone." *Id.* ¶ 28. Later in the conversation, she told Bieber that they belonged to her son, William, who was employed at the Hospital. *Id.* ¶ 29. Plaintiff, when asked about Hospital policy, stated that she was aware of the Hospital's No Solicitation Policy and that selling items such as chocolate would be a violation of that policy. *Id.* ¶ 28. She then reiterated that she was not selling the chocolates. *Id.* On this issue, however, Plaintiff has admitted, in response to Defendant's Rule 56.1 Statement, that she sold chocolates at the Hospital and that "she sold chocolates on numerous occasions, such as Christmas, Halloween, Easter and Valentine's Day." Pl.'s 56.1 Stmt. ¶ 80. As noted, she also has admitted that she sold chocolates in the shape of a man's penis in the hospital. Pl.'s Interr. Resp. No. 17.

With respect to affiant Bieber's statement of what transpired during his February 8, 2000 meeting with Plaintiff, Plaintiff has not contested, by affidavit or otherwise, his rendition of what transpired.

#### b. Meeting with Dierdre Duke

Later that day, at the request of Bieber, Deirdre Duke, Director of Human Re-

sources for the Hospital ("Duke"), interviewed Plaintiff. In that interview, Plaintiff admitted to Duke that she was selling chocolates at the Hospital, Duke Aff. ¶ 14, and that they were a special order for Artie Bretton, a fellow employee. *Id.* ¶ 15. Duke instructed Plaintiff not to speak with Bretton until she had an opportunity to speak with him first. *Id.* Plaintiff agreed not to do so. *Id.* ¶ 16. However, when Duke spoke with Artie Bretton later that day by telephone, Plaintiff called Bretton on his other line wanting to discuss the chocolates. *Id.* ¶ 18.

Here, again, Plaintiff has not disputed the evidence provided by Duke except to indicate that she "didn't remember Deirdre telling me not to call" Bretton. Pl.'s Dep. at 150.

### 3. February 9, 2000 [Time Sheet/ "Theft of Time"]

As the result of a snowstorm on January 25, 2000, several members of the MIS/Telecommunications Department did not report to work. Bieber Aff. ¶ 32. After a meeting between Vellucci and Bieber, it was agreed that anyone who did not come to work would be required to use a vacation or other benefit day. *Id.*

On February 9, 2000, Vellucci contacted Bieber to advise him that Plaintiff, who was scheduled to work, but did not go to the Hospital on January 25, 2000, failed to use a vacation day on her timesheet. *Id.*

¶ 33. After Vellucci met with Plaintiff about this discrepancy, Plaintiff agreed to use a vacation day for January 25, 2000. *Id.* ¶ 34. However, when Plaintiff submitted her *next* time sheet, it indicated that Plaintiff was present at the Hospital on January 25, 2000 and January 26, 2000, even though she did not report to work on either date. *Id.* ¶ 35.

Plaintiff contends that she worked from home on both dates, so she was not required to use a vacation day. Pl.'s Dep. at 106, 147.

### 4. February 10, 2000

On February 10, 2000, a meeting was held with Bieber, Vellucci and Plaintiff. During that meeting, Plaintiff was confronted with her time sheet which did not reflect the fact that Plaintiff failed to report to work on January 25, 2000. She admitted again that she did not report to work on January 25 or 26 and was advised that she was required to utilize vacation days to cover these missed days on her time sheet. Her explanation was that "her time sheet was submitted in error and that she was in the process of advising . . . . Mr. Vellucci's assistant[ ] of the errors." Bieber Aff. ¶ 46.[4]

When questioned about the erotic chocolates, Plaintiff stated that they were ordered for Artie Bretton and "the candy was never for sale, but that she was 'giving

4. At Plaintiff's deposition the following exchange took place:

Q: . . . If Tony Vellucci instructed the telecommunications department, including yourself, that if you didn't work on January 25 of 2000 at the hospital, if you didn't come in and work at the hospital, that you were to charge that time to sick time, and you wrote a W next on your time sheet next to January 25 of 2000, would that be an incorrect designation on your time sheet?
A: Absolutely.
Q: Is it possible that that occurred.

A: It's possible. E, but again, I'm also human.
Q: What do you mean?
A: Well, if that's what—what I'm saying it's possible, but everybody can make a mistake, but in answer to your question, yeah, it's possible.
Q: Are you saying if you did that it would have been a mistake?
A: You've lost me.
If I remembered his conversation and then I put down work, it would have been a mistake.
Pl.'s Dep. at 115–16.

the candy away.'" *Id.* ¶ 47. When asked why she contacted Bretton despite Duke's request not to do so, Plaintiff stated that she told Duke only that she would think about not calling him. *Id.* ¶ 49.

During this meeting, Bieber terminated Plaintiff's employment. *Id.* ¶ 52. She was advised that she was being terminated for "theft of time, sexual harassment and solicitation." Def.'s 56.1 Stmt. ¶ 45. Specifically, Defendant alleges the following bases for terminating Plaintiff: (1) Plaintiff's sale of chocolates violated the Hospital's No Solicitation Policy; (2) the possession and display of chocolates in the shape of a penis violated the Hospital's Sexual Harassment Policy; (3) Plaintiff's falsification of her time sheet; (4) insubordination by disobeying Duke's order not to interfere with her investigation by contacting Bretton about the chocolate lollipops; and (5) lying to her supervisors during the investigations into these incidents.[5] *See* Bieber Aff. ¶ 64.

During this meeting, the issue of Plaintiff's disability was not mentioned by either Bieber or Vellucci. Def.'s 56.1 Stmt. ¶ 102; Pl.'s 56.1 Stmt. ¶ 102. However, Plaintiff testified that "before this meeting, comments had been made that [she] had trouble getting around ... had been mentioned many time[s] before." Pl.'s Dep. at 158. Bieber never made such comments to her or otherwise referenced her disability. *Id.* at 159. Vellucci did "reference her disability" in some unspecified manner at some unspecified time prior to February 10, 2000. *Id.*

Plaintiff's position was filled In May, 2000 by Jennifer Pietruszka, an individual who had been working as a consultant for the Hospital since February 15, 2000. Bieber Aff. ¶ 59. There is no indication in the record that Ms. Pietruszka suffers from a disability.

In a complaint dated February 5, 2001, Plaintiff alleges that she was terminated from her employment because of her disability[6] and that Defendant's stated reasons are a pretext for this unlawful motivation.

## II. SUMMARY JUDGMENT STANDARD

In ruling on a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has come forward with evidence demonstrating that there is no genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's function is "not

---

**5.** Although Defendant's Local Civil Rule 56.1 Statement discusses, at length, representations made by Plaintiff in an application for disability benefits which are alleged to be false, any such conduct occurred after Plaintiff's termination and, therefore, will not be considered in deciding Defendant's summary judgment motion.

**6.** In Plaintiff's Brief in Opposition to Summary Judgment, she raises—for the first time—the argument that Defendant failed to accommodate her disability. The Court notes that this cause of action was not alleged in Plaintiff's complaint, nor was it contained in her charge filed with the EEOC. Therefore, it will not be entertained by the Court. *See Butts v. New York City Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993).

... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Giordano v. City of New York*, 274 F.3d 740, 746 (2d Cir.2001) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In ruling on a motion for summary judgment, the Court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002). The Court may not grant a motion for summary judgment "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir.2002). However, the Court is also cognizant of the fact that "in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." *Kerzer v. Kingly Manuf.*, 156 F.3d 396, 400 (2d Cir.1998).

To defeat a properly pled motion for summary judgment, a party may not rely on "unsupported assertions." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in h[er] favor." *Id.* The motion "will not be defeated merely ... on the basis of conjecture or surmise." *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)) (internal citation and quotations omitted).

## III. ANALYSIS

### A. Americans With Disabilities Act

#### 1. Determining The Appropriate Standard

Under the Americans with Disabilities Act, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

In the typical employment discrimination case, absent direct evidence of discrimination, the Court applies the burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, if a plaintiff proffers direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis does not apply.

#### a. Direct Evidence Of Employment Discrimination

Direct evidence has been defined as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997) (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)), *aff'd*, 175 F.3d 1008 (2d Cir.) (unpublished table decision), *cert. denied*, 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999); *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir.1989) ("[B]y definition, direct evidence, if be-

lieved by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.").

### b. Evidence Proffered by Plaintiff

■ Here, Plaintiff submits the following facts as direct evidence of Defendant's discriminatory intent: (1) comments by Vellucci asking Plaintiff, "are you okay" and (2) statements by Casper such as "Are you going to be able to make it?," "Can you, you know, get there?" and "is this too much for you?" Pl.'s Mem. Opp'n at 4, 9–10. These comments, to the obviously disabled Plaintiff, fall far short of constituting direct evidence of discrimination. *Raskin v. Wyatt*, 125 F.3d 55, 60 (2d Cir.1997). As explained by Plaintiff, the inquires about her well being typically, if not invariably, were voiced when she "was extremely short of breath[,]" Pl.'s Dep. at 178, had "trouble breathing[,]" *id.* at 179, or otherwise demonstrating signs of physical distress. *See generally id.* at 178–86.

Indeed, the genre of inquiries by Vellucci and Casper of which Plaintiff complains fall within the EEOC's definition of permissible inquiries. Consider the following excerpt from the EEOC publication entitled

"ENFORCEMENT GUIDANCE: DISABILITY RELATED INJURIES ... OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)": [7]

Questions that are permitted include the following:

asking generally about an employee's well being (e.g., How are you?) [or] asking an employee who looks tired or ill if s/he is feeling okay, .... [and] asking an

employee whether s/he can perform job functions.

It also warrants mention that Plaintiff did not find inquiries about whether she was "okay" from non-managerial personnel at the Hospital to be discriminatory. Def.'s 56.1 Stmt. ¶ 116, 117, and Plaintiff's response thereto in her Rule 56.1 Statement.

From these undisputed facts, there is no basis to conclude that these comments constitute direct evidence of discrimination. Therefore, the Court applies the burden-shifting analysis in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1983).

### 2. *McDonnell Douglas* Standard

A plaintiff requesting relief under the ADA bears the initial burden of establishing a prima facie case. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir. 1998). In order to establish a prima facie case under the ADA and the New York Human Rights Law,[8] an employee must show that (1) their employer is subject to the ADA; (2) the employee was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001); *see McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. A plaintiff's burden to establish a prima facie case of discrimination is minimal. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Plaintiff meets this burden, the burden shifts to the em-

---

**7.** Attached as Ex. R to Def.'s Not. of Mot. for Summ. J.

**8.** New York courts apply the same burden-shifting analysis in determining state law claims of employment discrimination. *See*

*Leopold v. Baccarat, Inc*, 174 F.3d 261, 264 n. 1 (2d Cir.1999) ("Because New York courts require the same standard of proof under the [New York Human Rights Law] as those brought under Title VII, we analyze these claims in tandem.").

ployer to "articulate a legitimate, non-discriminatory reason for its adverse employment action." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446 (2d Cir.1999) (internal quotations omitted), *cert. denied,* 530 U.S. 1289, 121 S.Ct. 3, 147 L.Ed.2d 1027 (2000). Once the employer meets this burden, the inquiry becomes whether the Plaintiff can show "that the proffered reason was not the true reason for the employment decision and that [her disability] was." *Id.* "The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains, at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207(1981).

### 3. Analysis of Plaintiff's Claim

Neither party disputes that Defendant is subject to the requirements of the ADA. *See* 42 U.S.C. § 12111(5)(A) (defining "employer" as "person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year"). It is also apparent that, for purposes of this summary judgment motion, Defendant does not contest that Plaintiff suffered from a disability or that Plaintiff suffered an adverse employment action. The issue then becomes whether the Defendant's actions took place under circumstances giving rise to an inference of discrimination.

### 4. Adverse Employment Action Occurred Under Circumstances Giving Rise To An Inference of Discrimination

Defendant submits that Plaintiff has failed to establish that her termination occurred under circumstances giving rise to an inference of discrimination. The Court agrees to the extent Plaintiff (1) contends that she has "[e]stablishe[d] the Doctrine of Stray Remarks[,]" Pl.'s Mem. Opp'n at 10, and (2) portrays herself as a victim of disparate treatment. *Id.* at 11–12, 14–15.

These two contentions will be discussed seriatim.

### a. Doctrine of Stray Remarks

■ Under the doctrine of stray remarks, disability-related statements constitute sufficient evidence of discrimination only if such comments are: "(1) disability related; (2) proximate in time to the adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Ruane v. Cont'l Cas. Co.,* No. 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998) (citing *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996)); *see also Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001) ("While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has the right to conclude that they bear a more ominous significance.' ") (quoting *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998)).

Plaintiff argues that remarks by Casper and Vellucci, asking her if she was okay or "is this too much for you?", evidence a discriminatory intent. As discussed earlier, these remarks are not disability related. Additionally, there is no evidence that the subject inquiries were made near the time of the adverse employment action. Thus, the first two factors mentioned in *Ruane* are absent. With respect to factors 3 and 4, it is undisputed that Bieber "was the person who actually decided to terminate Plaintiff's employment," Pl.'s Mem. Opp'n at 11, and that he never made a comment to Plaintiff which she construed as discriminatory. And finally, there is no evidence to suggest that the comments of

Vellucci and Casper may somehow be charged to Bieber.

### b. Disparate Treatment

Plaintiff fares no better on her disparate treatment claim, i.e., that she was treated differently than other similarly situated employees. Simply stated, the record is devoid of any scenarios "sufficiently similar to [P]laintiff's to support at least a minimal inference that the difference in treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.1997).

### c. Plaintiff's Replacement by a Non-disabled Employee

■ Plaintiff was terminated on February 10, 2000. On February 15, 2000, Jennifer Pietruszka was hired to fill her position. Anthony Vellucci testified that Ms. Pietruszka does not suffer from a disability "to [his] knowledge." Vellucci Dep. at 65.

The hiring of a non-disabled individual five days after the termination of Plaintiff satisfies Plaintiff's de minimus burden of showing that her adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 65 (2d Cir.1995) (replacement of pregnant employee by non-pregnant employee—inference of discrimination). Therefore, Plaintiff's evidence, when viewed in its most favorable light to her as the non-movant, satisfies the elements of a prima facie case of discrimination under the ADA. The next issue is whether Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.

### 5. Defendant's Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff

■ Defendant contends that Plaintiff was terminated for legitimate, nondiscriminatory reasons, viz. the five grounds previously listed. *Supra* at 149–150. "Because

defendants have articulated legitimate, nondiscriminatory reasons for having fired plaintiff, the burden shifts back to plaintiff to 'present[ ] sufficient evidence for a reasonable jury to conclude that [defendants] discriminated against him because of his age.'" *Schnabel v. Abramson,* 232 F.3d 83, 88 (2d Cir.2000). Plaintiff endeavors to meet that burden by relying on her prima facie case, coupled by a showing that Defendant's reasons for terminating her employment are a pretext for discrimination.

As explained by the Supreme Court in *Reeves v. Sanderson Plumbing Products,* "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, this does not mean that an ADA defendant may never succeed on a summary judgment motion when confronted with such evidence. *Id.* at 148–49, 120 S.Ct. 2097. *Schnabel,* 232 F.3d at 89–90. Rather, "*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the Plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097). While typically a Plaintiff who has established a prima facie case, plus pretext, will reach a jury on the ultimate question of discrimination, on occasion that is not so. *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001). Indeed, such an occasion was found in *Schnabel.*

With the above principles in mind, attention will now be directed to the question of whether the reasons provided by Defen-

dant for terminating Plaintiff are pretexts for disability-based discrimination.

### a. Time Sheets/Theft of Time

■ During Plaintiff's employment at the Hospital, there existed a Work Rules and Regulation Policy. This Policy states, in part, that

[m]anagement has a responsibility to inform all employees what is expected of them in their jobs, including the rules and regulations which govern the way they work. It is the responsibility of each employee to conduct themselves in a highly professional and adult manner at all times. No conduct which is disruptive, unproductive, immoral, unethical or illegal will be tolerated. The Hospital, of course, reserves the right to act in any circumstances in which it deems appropriate.

Mot. for Summ. J., Ex. F. It lists over twenty different types of conduct which would violate this Policy, including falsifying personnel or Hospital records, dishonesty, insubordination and violation of any other Hospital policies. *Id.* If this Policy is violated, there are provisions for corrective action, up to and including termination. *Id.*

In addition, the Hospital instituted a Weather Emergency Policy. That policy explains an employee's responsibility to report to work in the event of a weather emergency. Mot. for Summ. J. Ex. U. If an employee is scheduled to work, but is unable to report to work, that employee must use a vacation, holiday or personal day or, if the employee has no such days available to them, the employee would not be paid. *Id.* As an example of a violation of this policy, Defendant cites Plaintiff's time sheet for the dates January 25 and January 26, 2000, where it is indicated that she worked on those dates, even though she was not present at work and was previously instructed by Anthony Vellucci to use her vacation time for these dates.

An employee's falsification of a time sheet can constitute a legitimate, nondiscriminatory reason for terminating an employee. *Wade v. Lerner New York, Inc.,* 243 F.3d 319, 323 (7th Cir.2001); *Murray v. U.S. Dep't of Justice,* 821 F.Supp. 94, 104 (E.D.N.Y.1993); *Cf. Roge v. NYP Holdings, Inc.,* 257 F.3d 164 (2d Cir.2001) (employer's belief that employee committed disability fraud constitutes legitimate, nondiscriminatory reason for terminating employee).

Plaintiff argues that she did nothing wrong because Defendant gave her a laptop and she was permitted to work from home. Her testimony on this point is sparse and less than a model of consistency. *See* Pl.'s Dep. at 175–77. But Casper testified that Defendant provided Plaintiff with a laptop and that "she brought work home." Casper Dep. at 23. And Vellucci stated that, although he was not aware of any policy permitting Plaintiff to work from home, Plaintiff worked from home "[o]n occasion. I couldn't say the number of times." Vellucci Dep. at 30. Viewing this evidence the light most favorable to the non-movant, Plaintiff has met her burden—albeit barely—of raising a genuine issue of material fact as to whether this one of the several proffered reasons for her termination was a pretext. However, like her counterpart in *Schnabel,* Plaintiff "has not demonstrated that the asserted pretextual reasons were intended to mask ... discrimination." *Schnabel,* 232 F.3d at 88; *see also Reeves,* 530 U.S. at 148, 120 S.Ct. 2097 ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). "In fact, beyond the minimal proof required to state a prima facie case, [Plaintiff] has offered *no* evidence that [s]he was discriminated against

because of [her disability]." *Schnabel*, 232 F.3d at 88. In sum, Plaintiff has demonstrated the presence of a material issue of fact as to whether Defendants were correct or truthful in charging her with a theft of time; she has not demonstrated that a reasonable trier of fact could conclude that Defendant's position in this regard was a mask for discrimination.

Moreover, as to the other reasons advanced by Defendant for discharging Plaintiff, absent from the record is evidence suggesting that any of those may be deemed pretextual either as a mask for discrimination or otherwise. Those additional reasons will now be discussed.

### b. No Solicitation Policy

The undisputed evidence in the record shows that Plaintiff, as a member of management, was aware of the Hospital's No Solicitation/No Distribution Policy and knowingly violated that policy by selling chocolates, including sexual suggestive chocolates, at the Hospital. Pl.'s Dep. at 116–17; *see also* Pl.'s Resp. to Def.'s Interr. 17.

### c. Sexual Harassment Policy

Defendant's Sexual Harassment Policy states that "[t]he Hospital strongly disapproves of all acts of sexual harassment . . . ." Def.'s Mot. for Summ. J. Ex. E. The non-exclusive list of behaviors that constitutes sexual harassment includes "displaying or circulating materials that are sexually suggestive." *Id.* As noted, there is no question that Plaintiff, as a manager, possessed and displayed chocolates, on Hospital grounds, in the shape of a penis and also, incidentally, a woman's breast. Pl.'s Dep. at 127. Although the term "sexually suggestive" is not defined in the Hospital's policy, chocolates in the shape of male genitalia and a female breast clearly could legitimately be so labeled by administrators at St. Francis Hospital.

### d. Insubordination and Lying to Supervisors [Plaintiff's Conduct With Respect to Internal Hospital Investigation]

Another proffered basis for Plaintiff's termination is her conduct on February 9 and 10 during the Hospital's internal investigation of a complaint that she was selling sexually suggestive chocolates in the Hospital. An employee's failure or refusal to cooperate with an internal investigation can constitute a legitimate, nondiscriminatory reason for terminating one's employment. *See Tullo v. City of Mount Vernon*, 237 F.Supp.2d 493 (S.D.N.Y. 2002); *see also Schnabel v. Abramson*, 232 F.3d 83, 87–88 (2d Cir. 2000) ("outright insubordination"); *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir.1991) (misconduct and gross insubordination); *Allen v. Cabrini Nursing Home, Inc.*, 198 F.Supp.2d 442, 451 (S.D.N.Y.2002) (plaintiff's refusal to cooperate in internal investigation is legitimate nondiscriminatory reason for dismissal); *Sewell v. New York City Trans. Auth.*, 809 F.Supp. 208 (E.D.N.Y.1992) (insubordination is legitimate nondiscriminatory basis for terminating one's employment).

As noted, Plaintiff has not disputed the accuracy of statements contained in the affidavits of Bieber and Duke except to say that she does not recall being told by Duke not to call Bretton. But not recalling does not create an issue of fact.

Bieber's affidavit recites a series of statements by Plaintiff which are difficult to harmonize with one another, coupled with a false denial that she sold the sexually suggestive lollipops. To that extent, she impeded the hospital's investigation. It is questionable, however whether that conduct constituted insubordination. Nonetheless, such conduct does constitute lying to her supervisors.

Additionally, Duke stated she directed Plaintiff not to contact Bretton until she, Duke, completed her investigation. It is undisputed that the prohibited call was made. That constitutes insubordination, i.e., "a wilful or intentional disregard of the lawful instruction of the employer." BLACK'S LAW DICTIONARY 801 (6th ed.1990).

**e. Conclusion re Defendant's Proffered Reasons for Terminating Plaintiff's Employment**

There is no evidence in the record that Defendant's proffered reasons for terminating Plaintiff's employment were intended as a mask for disability-based discrimination.

## IV. PLAINTIFF'S STATE LAW CLAIM

Because the Court dismisses Plaintiff's federal claim, the Court declines, in the exercise of its discretion, to exercise supplemental jurisdiction over Plaintiff's state law claim. *See* 28 U.S.C. § 1367(c)(3); *Castellano v. City of New York,* 142 F.3d 58, 74 (2d Cir.) ("In light of the district courts' proper dismissal of the federal claims ... those courts did not abuse their discretion in declining to exercise jurisdiction over the state claims."), *cert. denied,* 525 U.S. 922, 119 S.Ct. 276, 142 L.Ed.2d 228 (1998); *Castellano v. Bd. of Trs.,* 937 F.2d 752, 758 (2d Cir.1991) (" 'If the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.' ") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996)).

## V. CONCLUSION

To partially reiterate, Plaintiff's prima facie case is weak. Moreover, although she has raised a question of fact regarding one of the five nondiscriminatory reasons advanced by Defendant for its decision to terminate her employment, there is no evidence in the record to indicate that the implicated charge was intended as a mask for discrimination. Therefore, Plaintiff's prima facie case and partial proof of pretext is insufficient to repel Defendant's well grounded motion for summary judgment. *See Reeves,* 530 U.S. at 148–149, 120 S.Ct. 2097; *Schnabel v. Abramson,* 232 F.3d at 87–91.

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The complaint is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**