Fedie R. REDD, Plaintiff,

v.

**NEW YORK STATE DIVISION OF PAROLE and José Burgos, Defendants.**

No. 07–CV–120 (NGG)(LB).

United States District Court, E.D. New York.

Dec. 20, 2012.

Gregory Scott Chiarello, Rebecca J. Osborne, Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY, for Plaintiff.

John E. Knudsen, Office of the Attorney General, Frederick Hongyee Wen, State of New York, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

Plaintiff Fedie R. Redd brought this action in 2007 against her former employer,

Defendant New York State Division of Parole ("DOP"). Redd's original pro se Complaint alleged sexual harassment, retaliation, and disparate treatment on the basis of race, color, gender, and religion, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). In 2010, this court granted DOP's motion for summary judgment on all of Redd's claims and dismissed her Complaint. *Redd v. N.Y. State Div. of Parole,* No. 07–CV–120 (NGG)(LB), 2010 WL 1177453 (E.D.N.Y. Mar. 24, 2010). Newly represented by counsel, Redd appealed the court's dismissal of her sexual harassment claim. The Second Circuit vacated this court's judgment to the extent that it dismissed her sexual harassment claim and remanded for further proceedings on that claim. *Redd v. N.Y. State Div. of Parole,* 678 F.3d 166 (2d Cir.2012). Still represented, Redd then amended her Complaint: (1) to add a claim against DOP for retaliatory discharge under Title VII; and (2) to add José Burgos, DOP's former Director of Human Resources Management, as a defendant for allegedly aiding and abetting DOP's retaliation, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(6) ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107(6) ("NYCHRL"). After the Defendants answered the Amended Complaint and the parties conducted discovery, Defendants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a), seeking dismissal of Redd's retaliation claim against DOP and her NYSHRL and NYCHRL claims against Burgos. The court resolves this motion today.

For the reasons set forth below, Defendants' motion for partial summary judgment is GRANTED. Redd's retaliation, NYSHRL, and NYCHRL claims are DISMISSED with prejudice. This case will proceed to trial solely for the purposes of resolving Redd's Title VII sexual harassment claim against DOP.

## I. BACKGROUND

The court will discuss only the facts pertinent to the Title VII retaliation, NYSHRL, and NYCHRL claims that it addresses in this opinion. Because Redd is the non-moving party, the court views these facts in the light most favorable to her. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 173 (2d Cir.2008).

Redd was employed by DOP as a parole officer ("PO") from April 30, 1990, until her termination on July 20, 2010. (Def. 56.1 St. (Dkt. 76) ¶ 10.) From 1993 through 2006, Redd was in DOP's Queens I Area Office (the "Queens Office"). (Pl. 56.1 St. (Dkt. 82) ¶ 88.) In January 2007, Redd was reassigned to the Central Long Island Area Office (the "CLI Office"), and worked there until her termination. (Def. 56.1 St. ¶ 10; Pl. 56.1 St. ¶ 89.)

At the Queens Office, Redd's immediate supervisor was Senior Parole Officer ("SPO") Clifford Crawford, and Crawford's supervisor was the Queens Office's Area Supervisor (or "Bureau Chief"), Sarah Washington. (Def. 56.1 St. ¶ 1.)

On September 16, 2005, DOP issued Redd a "Suspension Notice of Discipline" ("NOD") containing three disciplinary charges arising from Redd's alleged refusal to comply with orders given by Washington and Crawford to input parolee case files into DOP's computer system (the "2005 NOD"). (2005 NOD (Ex. A to Oct. 18, 2012, Wen Decl. ("Second Wen Decl.") (Dkt. 78–1)); *see also* Def. 56.1 St. ¶¶ 1, 3.) DOP sought a penalty of Redd's termination. (*See* 2005 NOD at 6.) Redd requested that the charges be heard by an arbitrator pursuant to the collective bargaining agreement ("CBA") between DOP and Redd's labor union. (Def. 56.1 St. ¶ 3.)

On November 1, 2005, Redd filed a charge with the New York State Division of Human Rights ("SDHR") alleging, among other things, that Washington. had sexually harassed her on three occasions in April, June, and September 2005 (the "2005 SDHR Charge"). (Dkt. 1–11.)

On January 31, 2006, an arbitrator found Redd guilty of all three charges in the 2005 NOD, and suspended Redd for two weeks without pay. (Jan. 31, 2006, Arb. Op. & Award (Ex. B to Second Wen Decl. (Dkt. 78–1)) ("2006 Arb. Op."))

On September 15, 2006, following an investigation, the SDHR dismissed the 2005 SDHR Charge, finding that there was no probable cause to believe that DOP had engaged in the unlawful discriminatory practices of which Redd had complained. (Dkt. 1–4.) On November 7, 2006, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the SDHR and mailed Redd a right-to-sue letter. (Ex. C to Second Wen Decl. (Dkt. 78–1).)

On January 4, 2007, following her reassignment to the CLI Office, Redd filed a pro se Complaint against DOP in this court, alleging sexual harassment by Washington, retaliation, and disparate treatment on the basis of her race (African American), color (black), gender (female), and religion (Protestant), in violation of Title VII. (Compl. (Dkt. 1).) DOP filed an Answer (Dkt. 8) and the case proceeded to discovery.

Part of that discovery included a June 9, 2008, deposition of Defendant José Burgos, who at the time was a non-party. (See June 9, 2008, Burgos Dep. Tr. (Ex. RR to Apr. 3, 2009, Wen Decl. (Dkt. 42–5)).) Burgos served as DOP's Director of Human Resources Management from 2003 until April 2011. (Def. 56.1 St. ¶ 12.) He oversaw the Employee Relations Office ("ERO"), which was involved in administering the employee disciplinary process. (Id.) From 2008 until 2011, Jean–Pierre Adrien worked directly under Burgos as the ERO's Labor Relations Representative, and was responsible for administering disciplinary and grievance processes for Regions I and III of DOP, which included the CLI Office.[1] (Id. ¶ 13; Pl. 56.1 St. ¶ 92.) At the CLI Office, two of the SPOs were Hunter Walker, Redd's supervisor, and Anthony Cotov. (Def. 56.1 St. ¶¶ 15–16.) Their supervisor was Irwin Davies, the Area Supervisor of the CLI Office. (Id. ¶ 14.) Burgos, Adrien, and Davies were all at some point aware of the 2005 SDHR Charge. (See Oct. 4, 2012, Burgos Dep. Tr. (Dkt. 83–2) at 105:3–7); Adrien Dep. Tr. (Dkt. 83–3) at 116:2–7); Davies Dep. Tr. (Dkt. 83–5) at 69:24–70:10; see also Pl. 56.1 St. ¶¶ 108–10.)

On June 11, 2008, Redd was counseled by Davies, Walker, Cotov, and another SPO regarding her alleged failure to take an order from Cotov. (Def. 56.1 St. ¶¶ 16–18.) Davies then issued Redd a "Counseling Memorandum," which had been reviewed and approved by Adrien. (See Redd Counseling Mem. (Ex. I to Second Wen Decl. (Dkt. 78–1)); Def. 56.1 St. ¶¶ 17–18; Pl. 56.1 St. ¶¶ 137–38.) According to DOP, a Counseling Memorandum is not a form of discipline (see Adrien Dep. Tr. at 308:3–12; see also Def. 56.1 St. ¶ 17; Pl. 56.1 St. ¶ 133), but such documents are maintained in DOP's files and are considered by the ERO when it determines how (if at all) to discipline an employee (Pl. 56.1 St. ¶¶ 134–35).

---

1. In 2011, DOP merged with New York's Department of Corrections to form a new joint office called the Department of Corrections and Community Supervision ("DOCCS"). (Def. 56.1 St. ¶ 93.) The same year, Burgos left DOCCS and went to the Office of Persons with Developmental Disabilities as Director of Labor Relations. (Id.) Burgos brought Adrien with him as his direct report. (Id.)

On July 7, 2008, Redd filed a second charge with the SDHR against DOP, Burgos, Adrien, and Davies, alleging that, by counseling her, they had discriminated and retaliated against her for filing the action in this court and for taking Burgos's deposition earlier that month (the "2008 SDHR Charge"). (Ex. G to Second Wen Decl. (Dkt. 78–1); *see also* Def. 56.1 St. ¶ 16; Pl. 56.1 St. ¶¶ 141–42.) Each of the defendants named in the charge received a copy of it from DOP's General Counsel. (Pl. 56.1 St. ¶ 142.)

On April 3, 2009, DOP moved for summary judgment on all of Redd's claims in this court. (Def. Mot. for Summ. J. (Dkt. 40).) The motion became fully briefed on June 1, 2009. (*See* Dkt. 42.)

On June 16, 2009, the Central Long Island Bureau held a meeting (the "Bureau Meeting"), attended by Redd and Davies, regarding a "Safety Day" event to occur the following day. (Pl. 56.1 St. ¶ 150.) At the meeting, Redd voiced her concern about the fact that DOP planned to hold the Safety Day event—which would involve processing a large number of parolees—without metal detectors despite a recent incident in Queens in which a parolee had threatened a PO with a knife. (Redd. Dep. Tr. (Dkt. 83–1) at 62:17–63:4; *see also* Davies Dep. Tr. at 97:2–15; Pl. 56.1 St. ¶ 151.) According to Davies, "Redd objected to [DOP] having a Safety Day at all and every time [he] spoke about it or every time a parole officer spoke in support of it she interrupted," and at one point she "told one of the parole officers to 'shut up.'" (Davies Dep. Tr. at 97:6–11.) According to Redd, two POs "hurled insults" at her when she voiced her opinions and Davies "allowed" them to do so. (Redd Dep. Tr. at 63:7–8.)

Safety Day occurred on June 17, 2009, and Redd was assigned to a post near the back of the building in which the event was being held. (Pl. 56.1 St. ¶ 156.) Redd claims that, early that morning, in front of other POs from other precincts, Davies "started yelling and screaming at [Redd]," accusing her of failing to "writ[e] parolee's [sic] names down." (Redd Dep. Tr. at 55:4–5.) Redd called one of DOP's Regional Directors, Gayle Walthall, and Walthall relieved Redd from her post. (Pl. 56.1 St. ¶ 158.) Redd then went back to her office. (*Id.* ¶ 159.)

The next day, June 18, 2009, Davies sent Walthall and Michael Burdi—a DOP Deputy Regional Director—an email describing Davies's version of the events that transpired at the Bureau Meeting and on Safety Day, which Burdi forwarded to Burgos and Adrien. (*See* June 18, 2009, Davies Email (Dkt. 83–28); *see also* Pl. 56.1 St. ¶ 160.) Davies later spoke with Adrien, Burdi, Walthall, and likely Burgos about the events, and they all agreed that Redd should be disciplined. (Pl. 56.1 St. ¶ 162.)

That same day, Redd was in DOP's New Rochelle Area Office at an unrelated grievance hearing for a fellow PO in her capacity as a representative for her labor union. (*Id.* ¶ 165.) Davies, Burdi, Walthall, PO Wayne Spence, PO Deborah Liehmann, and Warren Lew—Redd's union representative—were also present. (*Id.* ¶ 166.) Adrien, Burdi, and Walthall decided to conduct an "interrogation" of Redd regarding the Bureau Meeting and Safety Day. (Davies Dep. Tr. at 141:2–142:1.) An interrogation is a formal review that DOP must conduct before bringing disciplinary charges against members of Redd's union. (*See id.* at 82:17–23; Pl. 56.1 St. ¶ 167.) Adrien met with Lew and told him about the interrogation, and Lew "became very upset and stormed out of the meeting." [2] (Adrien Dep. Tr. at 142:7–8.)

---

**2.** Redd's 56.1 Statement alleges that Lew be- came upset and stormed out of the meeting

Adrien did not "remember how it happened," but a few seconds later, he, Lew, Redd, Spence, Liehmann, Burdi, and Walthall "ended up near or in [a] conference room." (*Id.* at 142:10–13, 148:12–18; Pl. 56.1 St. ¶ 171.) Adrien remembered that Lew and Burdi were speaking in raised voices; Burdi was saying that he needed to meet with Redd to secure her weapon prior to the interrogation, and Lew was disagreeing. (Adrien Dep. Tr. at 143:4–144:5, 146:12–19, 149:19–25.) Adrien did not recall anyone trying to leave the conference room and claims that Redd was always free to leave the room. (*Id.* at 149:3–6.)

Spence and Liehmann submitted Unusual Incident Reports ("UIR") about the incident in the conference room. (*See* Spence UIR (Dkt. 83–29); Liehmann UIR (Dkt. 83–30); *see also* Pl. 56.1 St. ¶ 173.) According to Spence, after Burdie and Lew argued, Burdie and Walthall directed Redd to follow them down the hallway from the conference room, but Lew was "attempting to get PO Redd to follow him instead." (Spence UIR.) Lew "was holding [Redd] by the left hand was attempting to get her back into the conference room while [ ] Walthall was pulling her by the right hand and saying to her 'Mrs. Redd come with me.'" (*Id.*; *see also* Liehmann UIR.) Redd broke free from Walthall and went into the conference room. (*See* Spence UIR; Liehmann UIR.) Lew attempted to

close the door to the room but it was forced open by Burdie and Walthall. (*Id.*) According to Spence, Burdie then "blocked the exit by standing in front of the door," and both Burdie and Walthall told Redd that she could not leave; Walthall and Adrien then attempted to block the exit as well. (Spence UIR; *see also* Liehmann UIR.) Lew and Redd approached the door, and Burdie went into a "bladed position" with his hand near his exposed weapon. (Spence UIR; Liehmann UIR; *see also* Pl. 56.1 St. ¶ 173.) At that point Lew gave up and told Redd to go with Burdie, Walthall, and Adrien, which she did. (*See* Spence UIR; Liehmann UIR.) Both Spence and Liehman alleged that they felt threatened by the behavior of Burdi, Walthall, and Adrien, and that they did not feel free to leave the conference room at the time. (*See* Spence UIR; Liehmann UIR.)

According to Burgos and Adrien, the UIRs filed by Spence and Liehmann regarding the meeting in the conference room were false.[3] (Oct. 4, 2012, Burgos Dep. Tr. at 164:12–17; Adrien Dep. Tr. at 162:18–163:2.) Spence and Liehmann were later given Counseling Memoranda stating DOP's conclusion that their UIRs had been false. (*See* Spence Counseling Mem. (Dkt. 83–32); Liehmann Counseling Mem. (Dkt. 83–33); *see also* Pl. 56.1 St. ¶ 200.)

---

because her union's "CBA required DOP to provide a PO with notice prior to an interrogation, which Redd had not received." (Pl. 56.1 St. ¶ 167 (citing Adrien Dep. Tr. at 141–42, 147, 150).) Redd has mischaracterized Adrien's deposition testimony; nowhere in the cited pages did Adrien explain the reasons why Lew became upset and stormed out of their meeting.

**3.** In her 56.1 Statement, Redd states that "Burgos acknowledged that Walthall may have placed a hand on Redd and directed her not to leave the conference room." (Pl. 56.1

St. ¶ 174 (citing Oct. 4, 2012, Burgos Dep. Tr. at 160).) Redd again mischaracterizes the record, this time even more flagrantly. Burgos's actual testimony was that *"even assuming* the fact that Ms. Walthall placed a hand on Ms. Redd and said don't leave, that would neither be an assault or [sic] violation necessarily." (Oct. 4, 2012, Burgos Dep. Tr. at 160:4–7 (emphasis added).) Burgos in no way "acknowledged that Walthall may have placed a hand on Redd," and indeed made clear that he did not "credit" the allegations to that effect made by Redd, Spence, and Liehmann. (*Id.* at 160:3–4.)

After the meeting in the conference room broke up, Adrien "ended up in Mr. Burdi's office along with Miss Walthall." (Adrien Dep. Tr. at 147:3–4.) At some point Redd came over and "said that she was not prepared to go forward with an interrogation that day." (*Id.* at 147:14–16; *see also* Pl. 56.1 St. ¶ 175.) Burdi, Walthall, and Adrien called Burgos to tell him what had happened, and he told them not to interrogate Redd that day. (*Id.* at 147:16–24.)

The same day, Redd filed a police report with the New Rochelle Police Department claiming that, during the attempted interrogation at the New Rochelle Area Office, Burdie and Walthall had "assaulted" her by preventing her from leaving the conference room (the "Assault Report"). (Ex. N to Second Wen Decl. (Dkt. 78–1); *see also* Def. 56.1 St. ¶ 24.) The police took no action on the Assault Report and Redd was not disciplined by DOP for filing the report. (*See* Oct. 4, 2012, Burgos Dep. Tr. at 166:22–168:12, 171:4–12; Def. 56.1 St. ¶¶ 26, 184.)

DOP did, however, discipline Redd for allegedly refusing to follow Davies's orders at the Bureau Meeting and on Safety Day. On June 22, 2009, DOP issued Redd an NOD—drafted by Adrien and signed by Burgos—containing six charges related to those events (the "2009 NOD"). (*See* 2009 NOD (Ex. K to Second Wen Decl. (Dkt. 78–1); Def. 56.1 St. ¶ 20; Pl. 56.1 St. ¶ 186.)) DOP sought Redd's permanent demotion to the position of Facility PO and reassignment to the Bedford Hills Correctional Facility. (*See* 2009 NOD.) That same day, Burgos interrogated Redd concerning the Bureau Meeting and Safety Day. (Pl. 56.1 St. ¶ 187.) Redd requested that her disciplinary charges be heard by an arbitrator. (Def. 56.1 St. ¶ 22; Pl. 56.1 St. ¶ 188.) On December 27, 2009, after hearing four days of testimony from, among others, nine fellow DOP employees (POs and SPOs), an arbitrator found Redd guilty of four of the six charges, and issued a penalty of three months' suspension without pay. (Dec. 27, 2009, Arb. Op. & Award (Ex. L to Second Wen Decl. (Dkt. 78–1)) ("2009 Arb. Op."); *see also* Pl. 56.1 St. ¶ 188.) Redd returned to work on January 5, 2010. (Def. 56.1 St. ¶ 23.)

On January 21, 2010, Redd filed another police report, this time with the Freeport Police Department, alleging that a man named Calvin Taylor had stalked her on several occasions (the "Stalking Report"). (Ex. O to Second Wen Decl. (Dkt. 78–1); *see also* Def. 56.1 St. ¶ 27; Pl. 56.1 St. ¶¶ 206–12.) On January 25, 2010, Redd filed a UIR with DOP making similar allegations. (Ex. P to Second Wen Decl. (Dkt. 78–1).)

After an investigation, the Freeport Police Department concluded that the Stalking Report was false and, on February 5, 2010, arrested Redd and charged her with filing a false written instrument, a Class A misdemeanor. (*See* Arrest Notification (Ex. Q to Second Wen Decl. (Dkt. 78–1)); Def. 56.1 St. ¶ 29; Pl. 56.1 St. ¶ 228.) DOP was notified of the arrest that same day. (Def. 56.1 St. ¶ 29.)

Under the CBA, DOP was permitted to suspend any employee who was arrested and to take further disciplinary action while the criminal proceeding was pending. (*See* CBA (Ex. S to Second Wen Decl. (Dkt. 78–1)) § 33.4(a)(2); *see also* Def. 56.1 St. ¶ 45.) Following Redd's arrest, Adrien contacted Lew to schedule an interrogation of Redd. (Def. 56.1 St. ¶ 30.) On February 25, 2010, Adrien issued an "Interrogation Notice" to Redd informing her that DOP had scheduled an interrogation regarding her arrest for March 3, 2010, at DOP's New Rochelle Area Office. (Interr. Notice (Ex. T to Second Wen Decl. (Dkt. 78–1)); *see also* Def. 56.1 St. ¶¶ 32–33.)

Sometime after February 25, 2010, but before the March 3, 2010, interrogation, Adrien drafted a "Notice of Suspension" ("NOS") to be sent to Redd informing her that she would be suspended without pay for her alleged false statement to the Freeport Police. (*See* NOS (Dkt. 83–38); Adrien Dep. Tr. at 289:19–290:19; Def. 56.1 St. ¶ 35; Pl. 56.1 St. ¶ 258.) Burgos played no role in drafting the NOS but reviewed and signed it as part of his official duties. (Oct. 4, 2012, Burgos Dep. Tr. at 259:12–260:9, 261:15–262:6.)

On March 2, 2010, 2010 WL 1177452, Magistrate Judge Lois Bloom issued a Report and Recommendation ("R & R") recommending that DOP's motion for summary judgment be granted as to Redd's disparate treatment and retaliation claims but denied as to her sexual harassment claim. (R & R (Dkt. 46).) The Clerk of Court entered the R & R on the public docket and emailed an Electronic Case Filing ("ECF") notification to DOP's counsel of record on March 3, 2010, at 8:22 a.m. (*See* Def. 56.1 St. ¶ 50; *see also* Dkt. 46.) Adrien claims that he had not been told about the R & R either before or during Redd's interrogation. (*See* Adrien Dep. Tr. at 296:3–15; *see also* Def. 56.1 St. ¶¶ 51–52.)

Around 11:00 a.m. on March 3, 2010, Adrien and Regional Director Steven Claudio interrogated Redd at the New Rochelle Area Office with Lew present. (Def. 56.1 St. ¶ 37.) Shortly after noon that day, Adrien served Redd with the NOS. (*Id.* ¶ 38; Pl. 56.1 St. ¶ 258.)

Sometime after March 22, 2010, but before March 25, 2010, Adrien drafted an NOD for Redd charging her with three violations of DOP's Employee Manual, including filing a false police report with the Freeport Police and a false UIR with DOP (the "2010 NOD"). (*See* 2010 NOD (Ex. V to Second Wen Decl. (Dkt. 78–1)); Adrien Dep. Tr. at 231:14–232:24, 294:6–296:7; Def. 56.1 St. ¶¶ 40–41.) DOP sought Redd's termination for these charges. (*See* 2010 NOD.) Burgos played no role in drafting the NOD but reviewed and signed it. (Oct. 4, 2012, Burgos Dep. Tr. at 262:12–263:13; *see also* Def. 56.1 St. ¶ 40.)

On March 23, 2010, the SDHR dismissed Redd's 2008 SDHR Charge, finding no probable cause to believe that DOP had engaged in unlawful discriminatory practices by counseling her in 2008. (Ex. J to Second Wen Decl. (Dkt. 78–1); *see also* Def. 56.1 St. ¶ 19.)

On March 24, 2010, this court issued a decision that adopted Judge Bloom's R & R in part and granted DOP's motion for summary judgment in its entirety. *Redd v. N.Y. State Div. of Parole*, No. 07–CV–120 (NGG)(LB), 2010 WL 1177453 (E.D.N.Y. Mar. 24, 2010). The Clerk of Court entered this opinion on the public docket and emailed an ECF notification to DOP's counsel on March 25, 2010, at 8:13 a.m. (*See* Def. 56.1 St. ¶ 54; *see also* Dkt. 48.) Adrien claims that he drafted the 2010 NOD before March 25 and was not aware of the dismissal of Redd's lawsuit while he was drafting it.[4] (Adrien Dep. Tr. at 294:6–8, 296:3–15; *see also* Def. 56.1 St. ¶ 55.) Burgos similarly claimed that he

---

**4.** Redd alleges that "Adrien[ ] could not recall when he drafted the NOD, but that it was after March 22, 2010 and could have been on March 25, 2010." (Pl. 56.1 St. ¶ 265 (citing Adrien Dep. Tr. at 294–95).) Redd has distorted the record yet a third time. Adrien made clear at several points during his deposition that he drafted the 2010 NOD before

March 25, 2010. (*See, e.g.*, Adrien Dep. Tr. at 294:6–8 ("Q. Do you recall if you would have drafted it on ... exactly March 25, 2010? A. No it would have been before that."); *id.* at 294:15:21, 296:3–7.) Redd's repeated attempts to mislead the court are not appreciated.

did not learn about the dismissal of the case until after he left DOP in 2011, and that he had not seen the actual R & R or this court's opinion until he was preparing for his deposition in October 2012. (*See* Oct. 4, 2012, Burgos Dep. Tr. at 234:10–238:9; *see also* Def. 56.1 St. ¶ 58.)

At some point on March 25, 2010—the day this court's opinion was entered—Adrien sent the 2010 NOD to Redd via certified mail. (*See* Def. 56.1 St. ¶ 42.) Redd requested that the charges in the 2010 NOD be heard by an arbitrator. (*Id.* ¶ 62.)

On March 29, 2010, a judge in Nassau County District Court granted Redd an Adjournment in Contemplation of Dismissal ("ACD") of her misdemeanor charge for filing the allegedly false Stalking Report. (*See* Mar. 29, 2010, Certificate of Disposition (Ex. W to Second Wen Decl. (Dkt. 78–1)); Mar. 29, 2010, Hr'g Tr. (Ex. X to Second Wen Decl. (Dkt. 78–1)); *see also* Def. 56.1 St. ¶ 43; Pl. 56.1 St. ¶ 273.) This meant that if Redd served a six-month probationary period without further arrests, the charge would be dismissed. (Def. 56.1 St. ¶ 43.)

On April 14, 2010, Redd appealed this court's grant of summary judgment to the Second Circuit Court of Appeals. (Notice of Appeal (Dkt. 50).)

On May 10, 2010, Adrien received a fax from Davies enclosing a May 7, 2010, Certificate of Disposition faxed from the Nassau County Criminal Clerk's Office explaining that Redd had been granted the ACD on March 29, 2010, and that if the case were not restored by September 28, 2010, it would be dismissed and sealed. (May 10, 2010, Certificate of Disposition (Ex. Y to Second Wen Decl. (Dkt. 78–1)); *see also* Def. 56.1 St. ¶ 44; Pl. 56.1 St. ¶ 270.)

On May 13, May 17, and June 15, 2010, Redd's 2010 NOD charges were tried before an independent arbitrator, Edward A. Battisti, affiliated with the American Arbitration Association. (Def. 56.1 St. ¶¶ 62, 64.) DOP was represented by Adrien and Redd was represented by an attorney provided by her union. (*Id.* ¶¶ 62–63.) Two police officers testified that Redd's accusations in the Stalking Report were false because Calvin Taylor was in a different part of Long Island at the time Redd alleged he had stalked her. (*Id.* ¶ 64.) Burgos and Davies testified that, because of Redd's arrest for filing a false police report, she would no longer have credibility with her supervisors and would no longer be able to supervise parolees effectively. (*Id.* ¶ 65.)

On July 16, 2010, the arbitrator determined that: (1) DOP's March 3, 2010, suspension of Redd was supported by probable cause; (2) Redd was guilty of all three charges in the 2010 NOD; and (3) termination was appropriate.[5] (July 16, 2010, Arb. Op. & Award (Ex. F to Second Wen Decl. (Dkt. 78–1)) ("2010 Arb. Op."); *see also* Def. 56.1 St. ¶¶ 67–68; Pl. 56.1 St. ¶ 301.)

On July 21, 2010, after having received the arbitrator's opinion and award, DOP terminated Redd, effective July 20, 2010. (*See* Ex. Z to Second Wen Decl. (Dkt. 78–1); *see also* Def. 56.1 St. ¶ 70.)

On August 28, 2010, Redd filed a pro se petition in New York State Supreme Court pursuant to Article 75 of the New York Civil Practice Law and Rules ("C.P.L.R."), naming both DOP and the arbitrator as respondents. (Art. 75 Pet. (Ex. FF to Second Wen. Decl. (Dkt. 78–1)).) Redd sought to vacate the arbitrator's award, alleging, among other things, that the arbitrator had been motivated by racial and

---

5. Additional details of the arbitrator's decision will be discussed in Part III.A.1.

gender bias and had failed to consider that other POs who had been brought up on more serious charges had not been terminated. (*Id.; see also* Def. 56.1 St. ¶ 71.)

On September 28, 2010, Redd's six-month probationary period ended and her criminal misdemeanor charge for filing a false written instrument was dismissed and sealed. (Def. 56.1 St. ¶ 44; Pl. 56.1 St. ¶ 274.)

On February 2, 2011, Justice Carol Huff of the New York State Supreme Court, New York County, denied Redd's Article 75 petition. (Feb. 2, 2011, N.Y. Sup. Ct. Decision (Ex. HH to Second Wen Decl. (Dkt. 78–2)).) Justice Huff found that "[t]he arbitrator's award [had] ample evidentiary support," and that Redd's allegations of racial bias and disparate treatment lacked "supporting evidence." (*Id.* at 2–3.)

On February 28, 2011, Redd appealed Justice Huff's decision, again arguing that the arbitrator's decision had been motivated by racial bias. (*See* Art. 75 Appeal (Ex. II to Second Wen Decl. (Dkt. 78–2)); *see also* Def. 56.1 St. ¶ 75.) On April 26, 2012, the Appellate Division, First Department, affirmed the denial of Redd's Article 75 petition. *Redd v. Battisti,* 94 A.D.3d 676, 943 N.Y.S.2d 84 (N.Y.App. Div. 1st Dep't 2012). The court found that "[t]he record amply support[ed] the arbitrator's findings," that Redd's "allegations of racial and gender bias [we]re speculative and without any evidentiary basis in the record," and that, "[i]n light of [Redd's] responsibilities as a parole officer, which depend[ed] in large part upon her veracity, her misconduct warranted the penalty of termination." *Id.* at 676–77, 943 N.Y.S.2d 84.

On May 4, 2012, the Second Circuit vacated this court's grant of summary judgment to the extent that it dismissed Redd's sexual harassment claim and remanded for further proceedings on that claim. *Redd v. N.Y. State Div. of Parole,* 678 F.3d 166 (2d Cir.2012).

After the mandate issued, on July 27, 2012, Redd moved through counsel to amend her Complaint. (Pl. Mot. to Amend (Dkt. 56).) DOP consented to the amendment (*see* Aug. 17, 2012, Order), and Redd filed her Amended Complaint on August 16, 2012, which: (1) added a claim against DOP for retaliatory discharge under Title VII (Am. Compl. (Dkt. 58) ¶¶ 58–61); and (2) added Burgos as a defendant for allegedly aiding and abetting the relation, pursuant to the NYSHRL (*id.* ¶¶ 62–64) and the NYCHRL (*id.* ¶¶ 65–68).

On August 21, 2012, the Appellate Division, First Department, denied Redd's motion for leave to appeal its decision on her Article 75 petition to the New York Court of Appeals. (Ex. KK to Second Wen Decl. (Dkt. 78–2).) On September 21, 2012, Redd filed a pro se motion directly with the New York Court of Appeals for leave to appeal the First Department's decision. (*See* Ex. LL to Second Wen Decl. (Dkt. 78–3); Def. 56.1 St. ¶ 80.) This motion was recently denied. *Redd v. Battisti,* 20 N.Y.3d 966, 958 N.Y.S.2d 328, 982 N.E.2d 91 (2012).

Defendants DOP and Burgos Answered Redd's Amended Complaint (Dkt. 66), and discovery on her new claims was completed on October 5, 2012 (*see* Sept. 6, 2012, Order). On November 13, 2012, Defendants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a), seeking dismissal of Redd's retaliation claim against DOP and her NYSHRL and NYCHRL claims against Burgos. (Def. Mot. for Partial Summ. J. (Dkt. 76); Def. Mem. (Dkt. 79).) Redd filed an opposition (Pl. Opp'n (Dkt. 80)) and Defendants replied (Def. Reply (Dkt. 85)). Trial is scheduled for January 28, 2012. (*See* Nov. 16, 2012, Minute Entry.)

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden to make this showing rests upon the party moving for summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is created by "specific facts" grounded in testimony or other admissible evidence, not by "mere allegations or denials" of the adverse party's pleadings, *id.,* "by the presentation of assertions that are conclusory," *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004), or "by conjecture[ ] or speculation" from the non-movant, *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

Summary judgment must be granted "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support [her] case is so slight." *Gallo v. Prudential Res. Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). In particular, it must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

## III. DISCUSSION

### A. Title VII Retaliation Claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII also has an anti-retaliation provision, which makes it unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under [Title VII]." *Id.* § 2000e–3(a). "This anti-retaliation provision is intended to further the goals of the anti-discrimination provision by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees." *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (internal quotation marks and alteration omitted). The provision "is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Terry v. Ashcroft,* 336 F.3d 128, 140–41 (2d Cir.2003) (internal quotation marks omitted).

At the summary judgment stage, "[r]etaliation claims under Title VII are evaluated under a three-step burden-shift-

ing analysis." *Hicks,* 593 F.3d at 164; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the burden is on the plaintiff to make the *"de minimis"* showing of a *"prima facie* case of relation." *Hicks,* 593 F.3d at 164. This requires her to demonstrate: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* Second, "[i]f the plaintiff sustains this initial burden, a presumption of retaliation arises," and "[t]he defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). Third, if the defendant meets its burden, "the presumption of retaliation dissipates," *id.,* and the burden shifts back to the plaintiff to present "evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation," *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

Defendants concede that Redd has satisfied the first three elements of her prima facie case: (1) she filed the 2005 SDHR Charge and her 2007 Title VII Complaint; (2) DOP knew about these activities; and (3) Redd was terminated in 2010. (*See* Def. Mem. at 10.) Defendants argue, however, that Redd has failed to establish a causal connection between her protected activities and her termination. (*See id.* at 10–17.) Before addressing the evidence Redd has offered to prove causation, the court must discuss how (if at all) its analysis is affected by the arbitrator's decision that Redd should be terminated.

### 1. *Arbitrator's Decision*

As discussed above, the 2010 NOD contained three charges arising from the allegedly false Stalking Report that Redd filed with the Freeport Police Department and the allegedly false January 25, 2010, UIR that Redd filed with DOP. (*See* 2010 NOD.) The arbitrator assigned to resolve these charges found that: (1) DOP's suspension of Redd on March 3, 2010, was supported by probable cause; (2) Redd was guilty of all three of the charges in the 2010 NOD; and (3) termination was the appropriate penalty. (*See* 2010 Arb. Op. at 8, 24.) As to the first conclusion, the arbitrator found that Redd's arrest and misdemeanor charges for filing a false written instrument called into question Redd's ability to "accurately and objectively report an incident" and undermined her ability to maintain "the confidence and support of [her] supervisors." (*Id.* at 19.) The arbitrator further found that DOP's evidence in support of the 2010 NOD charges was "sufficiently convincing" to support Redd's guilt, and specifically that Redd had "falsely accused Mr. Calvin Taylor of following her home from her work station." (*Id.* at 20.) And in concluding that termination was the appropriate penalty, the arbitrator found: (1) that "[t]he offense committed by [Redd was] extremely serious" because of the damaging "potential consequences to the victim of [her] false accusation" and the manner in which it reflected upon Redd and DOP (*id.* at 21–22); and (2) that Redd's past disciplinary record—including two prior suspensions—supported her termination. (*See id.* at 22–23.)

The arbitrator's decision does not *preclude* Redd's retaliation claim. *See Collins v. N.Y. City Trans. Auth.,* 305 F.3d 113, 119 (2d Cir.2002) ("[A] negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee."); *see also Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 59–60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Bottini v. Sadore Mgmt. Corp.,* 764

F.2d 116, 120–21 (2d Cir.1985).[6] However, the Second Circuit has held that "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive." *Collins*, 305 F.3d at 116. In such a case, "the Title VII plaintiff, to survive a motion for summary judgment, must present *strong* evidence that the [arbitrator's] decision was wrong as a matter of fact—e.g., new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Id.* at 119 (emphasis added); *see also Norris v. N.Y. City Housing Auth.*, No. 02–CV–6933 (RJH), 2004 WL 1087600, at *9 (S.D.N.Y. May 14, 2004) ("When [an arbitrator's] independent decision is not impeachable by reason of factual error or impartiality, it can overcome any inference that a plaintiff's termination was the result of discrimination or retaliation, and therefore prevent the plaintiff from meeting even the low threshold of making out a *prima facie* case of a Title VII violation.").

As in *Collins*, Redd "challenged [DOP]'s decision to fire [her] and was finally discharged only after the [arbitrator] made an independent inquiry, including the taking of evidence, and authorized termination." 305 F.3d at 118. And as in *Collins*, Redd "does not suggest that the [arbitrator] was not [ ] fully independent and unbiased."[7] *Id.* at 118–19. Thus, the arbitrator's decision is "highly probative of the absence of discriminatory intent in [Redd's] termination," and Redd must present "strong evidence" to survive summary judgment. *Id.* at 119.

■ In spite of *Collins*, Redd argues that the court should not afford significant weight to the arbitrator's decision because he did not address Redd's retaliation claims and did not hear evidence on those claims. (*See* Pl. Opp'n at 15–16.) But "the fact that the arbitration did not adjudicate [Redd's retaliation] claim is irrelevant to the evidentiary value of the decision." *Weeks v. N.Y. State Div. of Parole*, 78 Fed.Appx. 764, 766 (2d Cir.2003); *see also Simpson v. N.Y. State Dep't of Civ. Serv.*, No. 02–CV–1216, 2005 WL 545349, at *16 (N.D.N.Y. Mar. 1, 2005) ("Under *Collins* and its progeny, failure to address the [retaliation] issue in an arbitration does not diminish the impact of that arbitration on a subsequent [retaliation] action.... "[T]he [arbitrator's] decision [i]s relied on not as expressly dealing with the issue of ... retaliation, but as providing persuasive findings about the employee's misconduct."); *Roemer v. Bd. of Educ.*, 290 F.Supp.2d 329, 332 (E.D.N.Y.2003) ("Plaintiff simply misapprehends the difference between applying collateral estoppel and giving evidentiary weight to the arbitration." (citing *Collins*, 305 F.3d at 119)). In any event, although the arbitrator did not address the issue of retaliation

6. The state court decisions on Redd's Article 75 petition also do not preclude Redd's retaliation claim because these decisions did not address the merits of that claim. *See Bottini*, 764 F.2d at 121 (holding that a "prior Article 75 proceeding in state court d[id] not preclude plaintiff from pursuing his [Title VII] claim" because plaintiff "did not have a full review of the merits of his [Title VII claim] in state court").

7. Redd did indeed claim in her pro se Article 75 proceeding that the arbitrator had been motivated by racial and gender bias (*see* Art. 75 Pet.; Art. 75 Appeal), but does not make that argument with this court through her counsel (*see* Pl. Opp'n at 15–16; *cf.* Am. Compl. ¶¶ 52–53). In any event, the court agrees with the state courts that adjudicated Redd's Article 75 petition that there is nothing in the record to plausibly suggest racial or gender bias on the part of the arbitrator.

specifically, he heard all of the relevant information pertaining to Redd's alleged misconduct and her disciplinary history, and was therefore well-positioned to determine whether DOP's reasons for recommending her termination were proper. *See Collins*, 305 F.3d at 116–19.

### 2. *Redd's Evidence of Causation*

■ Keeping in mind the significant weight accorded the arbitrator's findings, the court turns to the evidence Redd has proffered of a causal link between her termination and her protected activities. Causation may be established "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). The court addresses these forms of evidence in reverse order.

### a. *Direct Evidence*

"Direct evidence" is "evidence tending to show, *without resort to inference*, the existence of a fact in question." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir.1992) (emphasis added); *see also Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir.2005) ("Direct evidence is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII."); *Laderach v. U–Haul*, 207 F.3d 825, 829 (6th Cir.2000) ("In discrimination cases, direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." (emphasis added)); *Costello v. St. Francis Hosp.*, 258 F.Supp.2d 144, 152 (E.D.N.Y.2003) ("direct evidence" is evidence that, " 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference. or presumption.' " (quoting *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir.1989))).

■ Redd offers one piece of supposedly direct evidence. (*See* Pl. Opp'n at 2, 17; Pl. 56.1 St. ¶ 118.) At Burgos's October 4, 2012, deposition, Redd's counsel asked him about the recommendation of Redd's termination in the 2010 NOD. (*See* Oct. 4, 2012, Burgos Dep. Tr. at 264:2–4.) Burgos noted that when he was presented with a proposed penalty that he disagreed with, he would typically object to the penalty or direct that it be amended. (*See id.* at 264:5–13.) Redd's counsel then asked about his decision not to amend the 2010 NOD:

> Q. And in this particular instance, do you recall why you chose not to make any amendments?
>
> A. Yes. In this particular instance the proposed termination penalty certainly seemed appropriate to me. It was the recommendation of my staff. It was consistent with what the management was saying and certainly seemed appropriate given that we were at a point in time. We are now as far as the Division of Parole was concerned [sic] Parole Officer Redd had filed a second false report with a police agency and as far as I was concerned *more than on two occasions had Parole Officer Redd falsely accused someone of behavior that there was no evidence to support.*
>
> Q. What were those two occasions?
>
> A. *Sarah Washington*, Mike Burdi and Gayle Walthall and the New Rochelle incident and now this event.

(*Id.* at 264:14–265:8 (emphases added).)

As a reminder, Sarah Washington was the Area Supervisor whom Redd alleged had sexually harassed her—one of the bases of Redd's 2005 SDHR Charge and her

Complaint with this court. Redd points out that "[t]he only accusation concerning Washington to which Burgos testified during his October 4, 2012 deposition was Redd's discrimination complaint." (Pl. 56.1 St. ¶ 267 (citing Oct. 4, 2012, Burgos Dep. Tr. at 105–108).) Thus, Redd concludes, "Burgos admitted he approved the decision to fire [her] in part because she had complained about Washington." (Pl. Opp'n at 17.) She argues that this "is direct evidence that the decision maker ultimately responsible for firing Redd was motivated by retaliatory animus." (*Id.*)

The court disagrees. The statements Burgos made at his deposition do not show retaliatory animus "without resort to inference." *Tyler*, 958 F.2d at 1183. Indeed, Redd herself draws multiple inferences to conclude that Burgos's statement was an admission of retaliation.

First, she infers that the false accusation against Washington that Burgos referenced was in fact the sexual harassment allegation Redd made to the SDHR. (*See* Pl. Mem. at 2.) She bases this inference on the fact that "Burgos did not testify about any accusation Redd made against Washington other than Redd's discrimination complaint." (*Id.*) That does not mean, however, that no other accusation occurred, and the court cannot tell from the record whether Redd accused Washington of any other purported misconduct during their long employment relationship. Rather than seeking clarification from Burgos on this point, Redd's counsel quickly switched topics, leaving the matter too am-

biguous to "require[ ] the conclusion" that Redd's termination was motivated by unlawful retaliatory animus.[8] *Laderach,* 207 F.3d at 829.

Second, even assuming Burgos was referring to Redd's accusation of sexual harassment, it requires another inferential step to conclude that this accusation influenced the ultimate decision to terminate her. The recommendation in the 2010 NOD was just that—a recommendation. So far as the court can tell, the decisionmaker ultimately responsible for Redd's termination was the arbitrator. (*See* CBA § 33.5(f)(5) ("The disciplinary arbitrator's decision with respect to guilt or innocence, *penalty,* probable cause for suspicion, or temporary reassignment ... *shall be final and binding on the parties* (emphases added)); Ex. Z to Second Wen Decl. (unsigned DOP form noting that, "[p]er arbitration decision employee has been terminated").)[9] The court finds nothing in the record to suggest that Burgos's views on Redd's accusations against Washington affected the arbitrator's decision, or even that the arbitrator was aware of these accusations. *See Davis v. Con–Way Transp. Central Express, Inc.,* 368 F.3d 776, 783 (7th Cir.2004) (statements by employees who *"recommended* [plaintiff's] termination" did not qualify as direct evidence because "they were not the ultimate decisionmakers" (emphasis added)); *see also Cardoso,* 427 F.3d at 433 ("Because [plaintiff's supervisor] was not the decisionmaker in question, his statement will not suffice as direct evidence of discrimina-

---

8. The 2005 NOD provides little guidance on this issue. It charged Redd with refusing Washington's order to input data from parolee case profiles into the computer system, and alleges that Redd stated to Washington: "What part of I ain't doing it don't you understand?" and "I'm going to file a grievance and write you up." (2005 NOD.) There is no detail in the 2005 NOD regarding whether Redd was accusing Washington of sexual

harassment during that incident or whether Redd was threatening to report Washington for some other purported misconduct arising from their dispute over the case profiles.

9. Redd's opposition brief asserts that Burgos was "the decision maker ultimately responsible for firing Redd" (Pl. Opp'n at 17), but does not point the court to evidence supporting this fact.

tion ...."). It is also important to note that Burgos played no role in drafting the 2010 NOD (*see* Oct. 4, 2012, Burgos Dep. Tr. at 262:12–263:13); his comments about Redd's accusations were an explanation of why the proposed penalty of termination "seemed appropriate" to him and thus did not require any amendment (*id.* at 264:18–19). There is no direct evidence that Burgos's views on Redd's accusations against Washington influenced or were shared by Adrien—the drafter of the 2010 NOD—and thus no clear indication that even the substance of the *NOD* (let alone the final termination decision) was affected by these views.

Finally, even assuming that Redd's sexual harassment accusations factored into the ultimate termination decision (which, as discussed above, is unclear), this does not mean that Redd's *protected activities*—filing the 2005 SDHR Charge and her Complaint—improperly motivated her termination. Burgos acknowledged that it was Redd's right to file a discrimination complaint. (*See* Oct. 4, 2012, Burgos Dep. Tr. at 123:7, 125:13–17.) And so at most, Burgos's deposition statements represented his personal belief that Redd's accusations against Washington were false, and that these accusations, along with her accusations against Burdi, Walthall, and Taylor, suggested to Burgos a pattern of dishonesty supporting Adrien's decision to recommend her termination. (*See id.* at 264:23–265:8.) Such a belief could properly inform Burgos's views on the NOD's recommendation. *See Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 745 (7th Cir.2010) (Title VII "doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination," such as "making frivolous accusations"); *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir.2005) ("[I]t [ ] cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly

defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment. To do so would leave employers with no ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact."); *Glover v. So. Cal. Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir.1999) (Title VII "does not permit employees to immunize improper behavior simply by filing an EEOC complaint"); *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 441 (W.D.Pa.2010) (Title VII's anti-retaliation provision "does not prevent an employer from imposing discipline on an employee who, while 'opposing' an 'unlawful employment practice,' takes it upon himself or herself to defame other employees").

To be sure, a reasonable juror could potentially draw the inferences discussed above from Burgos's deposition statements. The court does not—and, at the summary judgment stage, may not—resolve these ambiguities against Redd. *See Reeves*, 530 U.S. at 149, 120 S.Ct. 2097. The court simply concludes that Burgos's deposition statements do not qualify as *direct* evidence of retaliation—that is, evidence demonstrating retaliation "without resort to inference." *Tyler*, 958 at 1183; *see also Costello*, 258 F.Supp.2d at 152. In other words, although Burgos's statements must be considered along with the other *indirect* evidence of retaliation that Redd has proffered, they do not represent an "outright admission" of retaliation. *Cardoso*, 427 at 432.

### b. *Indirect Evidence*

 In the absence of direct evidence, causation may be established "indirectly," either: (1) "by showing that the protected activity was followed closely by discriminatory treatment"; or (2) "through other circumstantial evidence such as disparate treatment of fellow employees who en-

gaged in similar conduct." *Gordon,* 232 F.3d at 117. Redd attempts to establish causation under both a "temporal proximity" theory and a "disparate treatment" theory.

### i. Temporal Proximity

██ "The Second Circuit has not established a bright line rule as to how closely an adverse employment action must follow protected activity to imply that the former was in retaliation for the latter." *McDowell v. N. Shore–Long Island Jewish Health Sys., Inc.,* 788 F.Supp.2d 78, 82 (E.D.N.Y.2011) (citing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009)). Instead, it is the role of the court to "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal,* 558 F.3d at 129. The Supreme Court has stressed, however, that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

██ The gap in time between Redd's discrimination complaints—her 2005 SDHR Charge and 2007 pro se Complaint—and the adverse employment ac-

tion—Redd's termination in 2010—is too long under well-established case law to give rise to an inference of retaliation. *See id.* at 274, 121 S.Ct. 1508 (adverse employment action taken twenty months after protected activity "suggests, by itself, no causality at all"); *Williams v. Woodhull Med. & Mental Health Ctr.,* No. 10–CV–1429 (NGG)(LB), 2012 WL 555313, at *2 (E.D.N.Y. Jan. 31, 2012) (Rpt. & Rec.) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."), *adopted by* 2012 WL 567028 (E.D.N.Y. Feb. 21, 2012); *Baez v. Visiting Nurse Serv. of N.Y. Family Care Serv.,* No. 10–CV–6210 (NRB), 2011 WL 5838441, at *6 (S.D.N.Y. Nov. 21, 2011) ("[T]he yearlong gap between two events far exceeds the normal span of time from which causality may be inferred."); *see also Butler v. Raytel Med. Corp.,* 150 Fed.Appx. 44, 47 (2d Cir.2005) (one year held to be too remote); *Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990) (three months held to be too remote); *McDowell,* 788 F.Supp.2d at 83 (same).

Nevertheless, Redd makes two arguments as to why the timing of the events in her case supports an inference of causation.[10]

First, she argues that "[m]ultiple acts of protected activity may be considered in

---

**10.** Redd does not attempt to argue that any of the disciplinary actions DOP took against her *before* its decision to terminate her—and before this court's 2010 summary judgment decision—constitutes retaliation. In any event, the only apparent disciplinary action that closely followed Redd's November 1, 2005, SDHR charge was the two-week suspension that DOP imposed on January 31, 2006, based on the 2005 NOD (*see* 2006 Arb. Op.), and this NOD had been issued *prior* to Redd's SDHR charge. *See Clark,* 532 U.S. at 272, 121 S.Ct. 1508 ("Employers need not suspend previously planned [adverse employment ac-

tions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). The June 11, 2008, Counseling Memorandum (even assuming it constitutes an adverse employment action), the June 22, 2009, NOD, and the February 25, 2010, NOS were all issued more than seventeen months after Redd's Complaint and more than three years after the 2005 SDHR charge—far too long of a gap. *See Williams,* 2012 WL 555313, at *2; *Baez,* 2011 WL 5838441, at *6; *see also Butler,* 150 Fed.

determining temporal proximity in retaliation cases," and that she "engaged in a number of protected actions between 2005 and 2010 including: filing a case with this Court, taking the depositions of decision makers (including Burgos), and opposing defendants' summary judgment motion." (*Id.* at 17–18.) As an initial matter, the court seriously doubts that every single activity a plaintiff conducts in connection with an ongoing litigation can constitute a separate "protected activity" that would restart the causation clock; if that were true, just about any adverse employment action taken during a lengthy discrimination case could be considered the result of retaliatory animus. *Cf. Clark*, 532 U.S. at 273, 121 S.Ct. 1508 (referring to the protected activity as the "filing of the EEOC complaint"). But even assuming that all of the actions Redd mentions would constitute separate protected activities *and* that the pertinent DOP officials were aware of them at the pertinent times, these events all took place more than seven months before DOP issued the 2010 NOD and more than a year before Redd's actual termination on July 20, 2010. (*See* Pl. 56.1 St. ¶¶ 119–20 (depositions of DOP decisionmakers took place in June and July 2008); Dkt. 44 (opposition to summary judgment dated May 13, 2009, and filed June 1,

2009).) That is still not a close enough temporal proximity to create an inference of causation, *see Williams*, 2012 WL 555313, at *2, particularly in light of the weight accorded the arbitrator's findings.

Second, Redd argues that a juror could infer causation based on the timing of Judge Bloom's March 2, 2010, R & R and this court's March 24, 2010, summary judgment decision relative to the March 25, 2010, NOD. (*See* Pl. Opp'n at 18.) But DOP had begun the process of disciplining her for filing the Stalking Report—the basis of the 2010 NOD—prior to the R & R and this court's decision, including by sending her the Interrogation Notice on February 25, 2010, and drafting the NOS. The fact that DOP's disciplinary actions were already in the works before the R & R and this court's opinion belies Redd's argument that DOP retaliated against her as a result of these judicial issuances. *See Clark*, 532 U.S. at 272, 121 S.Ct. 1508 ("Employers need not suspend previously planned [adverse employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is *no evidence whatever of causality*." (emphasis added)); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001).[11]

Appx. at 47; *Hollander*, 895 F.2d at 85; *McDowell*, 788 F.Supp.2d at 83.

11. This fact distinguishes Redd's case from *Espinal*, which she cites for the proposition that "an indirect causal connection can be established if retaliation closely follows dismissal of a case." (Pl. Opp'n at 18 n. 6 (citing *Espinal*, 558 F.3d at 129).) *Espinal* is distinguishable for two other reasons. First, the plaintiff in that case, unlike Redd, offered direct evidence of retaliatory animus. *See Roseboro v. Gillespie*, 791 F.Supp.2d 353, 369 n. 23 (E.D.N.Y.2011) ("*Espinal* is distinguishable because, unlike the current case, the officers involved in [a retaliatory beating of the plaintiff] told the plaintiff that 'this is what happens to [i]nmates when they submit

law suits against us.'" (alteration in original) (quoting *Espinal*, 558 F.3d at 122)). Second, *Espinal* held that the plaintiff sufficiently alleged causation because "[i]t [was] plausible that the officers waited to exact their retaliation at an opportune time." 558 F.3d at 129. Redd argues that "[a] reasonable juror could conclude that DOP officials were looking for an opportunity to fire Redd because of her discrimination complaints" and "believed that, given Magistrate Judge Bloom's decision, DOP would soon be in the clear vis-à-vis Redd's discrimination claims." (Pl. Opp'n at 18.) But the R & R recommended that summary judgment be granted only *in part*—and in any event had no binding effect—so it is hard to imagine that DOP believed that the R

Moreover, Redd provides the court with no good reason to believe that the pertinent DOP officials even *knew* about the R & R or this court's summary judgment decision at the time they took the disciplinary actions against Redd, let alone that these judicial issuances gave them a new reason—not present in the previous three years—to discipline Redd. The R & R was entered on the public docket at 8:22 a.m. on March 3, 2010 (Def. 56.1 St. ¶ 50; *see also* Dkt. 46), less than three hours before Adrien's *previously scheduled* interrogation of Redd regarding the Stalking Report (*see* Def. 56.1 St. ¶ 37), and Redd does not appear to dispute Adrien's allegation that he had not been told about the R & R prior to the interrogation (*see* Adrien Dep. Tr. at 296:3–15; *see also* Def. 56.1 St. ¶¶ 51–52). And Adrien drafted the 2010 NOD recommending Redd's termination before March 25, 2010 (*see* Adrien Dep. Tr. at 294:6–296:7; Def. 56.1 St. ¶ 40–41; *supra* n. 4), the day the court's decision on the R & R was entered on the public docket (*see* Dkt. 48), and Redd does not seem to take issue with his claim that he was unaware of the dismissal of Redd's lawsuit when he drafted it (*see* Adrien Dep. Tr. at 296:3–15; *see also* Def. 56.1 St. ¶ 55).

For these reasons, Redd cannot establish causation based on the temporal proximity between her protected activities and her termination.

> ii. Disparate Treatment

■ As another form of indirect evidence, Redd argues that other POs received more lenient treatment for more serious offenses than those Redd committed. (*See* Pl. Opp'n at 10–11, 19.) She argues that "DOP did not recommend the termination of, or even institute charges against, other POs who were arrested but who had not filed discrimination or retaliation charges against DOP." (*Id.* at 10.) She gives a number of examples. (*See* Pl. 56.1 St. ¶¶ 277–89.)

■ "An inference of discrimination may arise if a plaintiff can show that [s]he was treated differently than similarly situated employees." *Simpson,* 2005 WL 545349, at *11. But "[t]o be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in *all material respects.*" *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (emphasis added). This standard "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases"—a determination that must be made based on both "an examination of the acts" *and* "an examination of the context and surrounding circumstances in which those acts [we]re evaluated." *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000). Crucially, "[i]t is well settled that employees are not similarly situated if they have materially different disciplinary records." *Dinkins v. Suffolk Transp. Serv., Inc.,* No. 07–CV–3567 (JFB)(AKT), 2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010) (collecting cases); *see also Rosario v. Hilton Hotels Corp.,* 476 Fed. Appx. 900, 901 (2d Cir.2012) (holding that although some of the plaintiff's co-workers received greater wage increases than the plaintiff, "he failed to establish that he was 'similarly situated' to those employees, given his disciplinary history at that time"); *Smith v. New Venture Gear, Inc.,* 319 Fed.Appx. 52, 55 (2d Cir.2009) (plaintiff's

---

& R put it "in the clear," or why the R & R otherwise made it an opportune time to fire Redd. *See Robles v. Cox & Co., Inc.,* 841 F.Supp.2d 615, 629 (E.D.N.Y.2012) (distinguishing *Espinal* on the basis that "Plaintiff

ha[d] not alleged any facts from which the Court c[ould] infer that [the time of the adverse employment action] was a more 'opportunity time' to terminate her employment").

evidence was "wholly insufficient to show that the employees involved were similarly situated to" him in part because he had failed to provide evidence of "the disciplinary records of the individuals involved"); *Santiago v. City of New York*, No. 05–CV–3668 (RRM)(VVP), 2009 WL 935720, at *10 (E.D.N.Y. Mar. 31, 2009) ("[P]laintiff's history of absences and attendance counseling makes her not similarly situated to other [correctional officers] with similar records and tenure but without a history of absenteeism.").

Redd's disparate treatment analysis is composed of a page-long bulleted list stating only the particular PO's isolated instance of alleged misconduct and DOP's action or inaction. (*See* Pl. Opp'n at 10–11.) She provides no information at all as to "the context and surrounding circumstances" of the alleged comparators' acts, including information as to their disciplinary records. *Graham*, 230 F.3d at 40. As discussed above, Redd had a substantial disciplinary history apart from the penalty she received for the allegedly false Stalking Report (*see* 2006 Arb. Op.; 2009 Arb. Op.), which played an important role in DOP's decision to terminate her (*see* 2010 Arb. Op. at 22–23). Whether the alleged comparators had similar disciplinary histories is important to whether their actions called for the same penalty that Redd received. *See Dinkins*, 2010 WL 2816624, at *10. Thus, even assuming these other POs in fact received more lenient penalties for more serious misconduct, they do not support Redd's causation argument because she has failed to show that they were similarly situated "in all material respects." [12] *Shumway*, 118 F.3d at 64.

### 3. Summary of Conclusions on Title VII Retaliation Claim

In sum, to establish a prima facie case of retaliation, Redd must show a causal connection between her protected activities and her termination. *See Hicks*, 593 F.3d at 164. Although this is normally a low threshold, Redd's burden is enhanced because an independent arbitrator found after an evidentiary hearing that she should be terminated, *see Collins*, 305 F.3d at 116, based in part on his finding that Redd had made a false stalking accusation and on her disciplinary record (*see* 2010 Arb. Op. at 20–23). The arbitrator's decision is "highly probative" of the absence of causation, and can be overcome only by "strong evidence that [it] was wrong as a matter of fact . . . or that the impartiality of the proceeding was somehow compromised." *Collins*, 305 F.3d at 119. Redd has not even attempted to demonstrate to this court that the arbitrator's decision was factually incorrect or that she did not receive an impartial proceeding. (*See* Part III.A.1.)

Indeed, Redd has provided no "strong evidence" in support of her causation element. The temporal proximity between Redd's protected activities and her termination is far too lengthy to give rise to an inference of retaliation. *See Clark*, 532 U.S. at 274, 121 S.Ct. 1508; *Williams*, 2012 WL 555313, at *2. (*See* Part III.A.2.b.i.) And Redd has not shown that other POs who were "similarly situated in all material respects" were treated differently from her, *Shumway*, 118 F.3d at 64, particularly because of her failure to provide any evidence as to their disciplinary histories, *see Dinkins*, 2010 WL 2816624, at *10. (*See* Part III.A.2.b.ii.) Redd is thus left with the views Burgos briefly

12. Because the court concludes that Redd's disparate treatment argument fails on the merits, it need not address Defendants' contention that she is collaterally estopped from

raising that argument because it was rejected in her Article 75 proceeding. (*See* Def. Mem. at 20–21.)

expressed at his deposition. (*See* Part III.A.2.a.) These views, however, were not necessarily related to Redd's harassment allegations, did not necessarily factor into the ultimate decision to terminate her, and did not necessarily express any views as to Redd's protected activities. (*See id.*) Although a jury could possibly infer retaliatory animus from Burgos's passing comments, that inference alone would simply be much too weak to overcome the significant weight given to the arbitrator's decision. *See Collins*, 305 F.3d at 119; *Simpson*, 2005 WL 545349, at \*16. Summary judgment is therefore proper as to Redd's Title VII retaliation claim because she has failed to make a showing sufficient to establish the essential element of causation.[13] *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

**B. State and City Law Claims**

Redd also brings claims against Burgos under the NYSHRL and NYCHRL for allegedly aiding and abetting DOP's retaliation. (Am. Compl. ¶¶ 62–68.) *See* N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8–107(6). Because these provisions contain virtually identical aiding-and-abetting provisions, they are evaluated under the "same standards of analysis." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir.2004) (collecting cases).

■ Under New York law, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (citing *Murphy v. ERA United Realty*, 251 A.D.2d 469, 472, 674 N.Y.S.2d 415 (N.Y.App.Div.2d Dep't 1998)); *see also Raneri v. McCarey*, 712

F.Supp.2d 271, 282 (S.D.N.Y.2010) ("An individual cannot aid and abet his own alleged discriminatory conduct."). Moreover, with respect to the liability of the employer/principal, "identical standards apply to employment discrimination claims brought under Title VII, ... [the NYSHRL], and the [NYCHRL]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir.2000); *see also McDowell*, 788 F.Supp.2d at 83 ("New York State Human Rights Law causes of action for discrimination and retaliation are [ ] analyzed under [the Title VII] rubric.").

Because Redd's Title VII retaliation claim lacks merit, she has not established principal liability for the DOP under the NYSHRL and NYCHRL. *See Weinstock*, 224 F.3d at 42 n. 1; *Williams*, 2012 WL 555313, at \*2; *McDowell*, 788 F.Supp.2d at 83. By extension, she cannot establish aider-and-abettor liability for Burgos. *See Raneri*, 712 F.Supp.2d at 282; *DeWitt*, 48 F.Supp.2d at 293. Summary judgment is therefore appropriate as to Redd's NYSHRL and NYCHRL claims against Burgos.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' motion for partial summary judgment is GRANTED. Redd's Title VII retaliation, NYSHRL, and NYCHRL claims are DISMISSED with prejudice. This case will proceed to trial solely for the purposes of resolving Redd's Title VII sexual harassment claim against DOP.

SO ORDERED.

---

**13.** Because Redd's Title VII claim fails on the merits, the court need not decide whether, as Defendants argue (*see* Def. Mem. at 9), Redd failed to exhaust her administrative remedies. *See Klaper v. Cypress Hills Cemetery*, No. 10–

CV–1811 (NGG)(LB), 2012 WL 959403, at \*7 n. 7 (E.D.N.Y. Mar. 21, 2012); *see also Francis v. City of New York*, 235 F.3d 763, 767–68 (2d Cir.2000) (exhaustion requirement is non-jurisdictional).